Robert W. **KELLEY**, Individually and representative of the class

v.

**METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE**, et al.

Henry C. **MAXWELL**, Jr., Individually and representative of the class

v.

**METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE**, et al.

Nos. 2094, 2956.

United States District Court, M. D. Tennessee, Nashville Division.

May 20, 1980.

See also D.C., 479 F.Supp. 120.

Avon N. Williams, Jr., Richard H. Dinkins, Nashville, Tenn., Plaintiffs Intervenors, Carrol D. Kilgore, William E. Higgins, Nashville, Tenn., for plaintiff.

William R. Willis, Jr., Marian F. Harrison, Nashville, Tenn., for defendants.

## MEMORANDUM OPINION

WISEMAN, District Judge.

The present posture of this case and this Court's action thereon require a recitation of the tortuous twenty-five-year history of desegregation efforts in Metropolitan Nashville.

### I. HISTORY OF NASHVILLE-DAVIDSON COUNTY DESEGREGATION PRIOR TO 1971

On September 23, 1955, plaintiff Robert W. Kelley filed this class action lawsuit to enforce *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), decided the previous year, and to enjoin the defendant Board of Education of the City of Nashville from continuing to operate a segregated school system. A three-judge court was convened in this district,[1] but,

---

1. The three-judge court was convened pursuant to 28 U.S.C. § 2281, since plaintiffs contested the constitutionality of Tennessee law mandating segregation, T.C.A. §§ 49–3701 to 49–3704. These statutes, enacted in 1901, prohibited interracial schools and the teaching of interracial classes. Misdemeanor penalties were prescribed for violation of this law. Section 49–3701 provided that "[i]t shall be unlawful for

any school, academy, college, or other place of learning to allow white and colored persons to attend the same school, academy, college, or other place of learning." Acts 1901, ch. 7, § 1; Shann., § 6888a37; Code 1932, § 11395. Correlatively, section 49–3702 provided as follows:

It shall be unlawful for any teacher, professor, or educator in any college, academy, or school of learning, to allow the white and

upon defendants' concession that the law was unenforceable under *Brown*, the three-judge court was dissolved for lack of jurisdiction and the case remanded to a single district judge of this Court. *Kelley v. Board of Educ.*, 139 F.Supp. 578 (M.D.Tenn. 1956).

After a hearing on the proposed plan for desegregation submitted by the defendant Board, the Court, on January 21, 1957, approved the plan insofar as it provided for desegregation for grade one in the year 1957–58, but ordered the Board to develop a plan to eliminate segregation in the remaining grades. *Kelley v. Board of Educ.*, 2 Race Rel.L.Rep. 21 (M.D.Tenn.1957). On February 18, 1958, this Court rejected as unconstitutional the Board's proposed plan, essentially modeled after the Parental Preference Law, T.C.A. § 49–3704,[2] passed in January of 1957, and previously held unconstitutional by this Court in *Kelley v. Board of Educ.*, 2 Race Rel.L.Rep. 970 (M.D.Tenn. 1957). The proposed plan proscribed mandatory integration or segregation in any grade but permitted parents to choose between sending their children to a one-race or integrated school. The Court allowed the defendant Board two months to file another plan for desegregation of all grades.[3] *See Kelly (sic) v. Board of Educ.*, 159 F.Supp. 272 (M.D.Tenn.1958). On June 19, 1958, this Court approved the proposed Board plan that provided for elimination of compulsory segregation in grade two as of the academic year 1958–59 and in one additional grade a year thereafter. *See Kelley v. Board of Educ.*, 3 Race Rel.L.Rep. 651 (M.D.Tenn.1958), *aff'd*, 270 F.2d 209 (6th Cir.), *cert. denied*, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959).[4]

At the time *Kelley v. Board of Education* was filed, Davidson County, surrounding Nashville, and the City of Nashville maintained separate school systems. Because the *Kelley* order had no effect upon the county school system, which continued to operate as a segregated system, plaintiff Henry C. Maxwell, Jr., filed a class action complaint on September 19, 1960, which paralleled the complaint previously filed by plaintiff Kelley against the Board of Education of the City of Nashville. On November 23, 1960, this Court approved a gradual desegregation plan submitted by defendant County Board of Education but modified the proposed one-grade-a-year component to require that immediate desegregation take place in grades one through four with an additional grade each year in the future. By so ordering, the Court placed the county school system on the same grade-a-year basis as the city school system. *See Maxwell v. County Bd. of Educ.*, 203 F.Supp. 768 (M.D.Tenn.1960), *aff'd*, 301 F.2d 828 (6th Cir. 1962), *aff'd in part, rev'd in part, sub nom. Goss v. County Board of Educ. of Knoxville*, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963).[5]

colored races to attend the same school, or for any teacher or educator, or other person to instruct or teach both the white and colored races in the same class, school, or college building, or in any other place or places of learning, or allow or permit the same to be done with their knowledge, consent, or procurement.
Acts 1901, ch. 7, § 2; Shann., § 6888a38; Code § 11396.

2. Section 49–3704 read as follows: "Separate schools authorized.—Boards of education of counties, cities and special school districts in this state are authorized to provide separate schools for white and Negro children whose parents, legal custodians or guardians voluntarily elect that such children attend school with members of their own race." Acts 1957, ch. 11, § 1.

3. At the same time, the Court denied defendants' motion to dismiss that was grounded on the adequacy of the administrative remedy provided in the Pupil Assignment Act, also enacted in January of 1957. *See* Pub.Acts 1957, cc. 9–13.

4. Plaintiffs appealed from the Court's order because they asserted that *Brown* mandated that desegregation be achieved with more celerity than one grade per year. Defendants, on the other hand, appealed the Court's ruling that the portion of the plan that implemented the Parental Preference Law was unconstitutional.

5. The plan, as approved by this Court and affirmed by the Court of Appeals, included a minority-to-majority transfer option for students who would otherwise be zoned to schools in which they would be in a racial minority. This provision is the converse of the majority-

On September 10, 1963, after the City of Nashville and Davidson County merged into a metropolitan government, the *Kelley* and *Maxwell* cases were consolidated by consent order and the Board of Education for Metropolitan Nashville-Davidson County was substituted as defendant.[6] The case has remained in the same posture since 1963, with the primary defendant being the Metropolitan County Board of Education of Nashville and Davidson County. No significant action was taken by this Court in regard to school desegregation until over six years later.[7]

Upon plaintiffs' motion for injunctive relief, this Court, on November 6, 1969, issued a temporary restraining order, enjoining defendant Board from purchasing new school sites, building new school facilities, or expanding existing school facilities, until a hearing on the motion. After such hearing, the Court, on July 16, 1970,[8] enjoined the Board from school construction not commenced as of the date of the restraining order, and ordered that the Board devise a comprehensive plan for a unitary school system that included, *inter alia*, rezoning and school construction to maximize school integration. *Kelley v. Metropolitan County Bd.*

*of Educ.*, 317 F.Supp. 980 (M.D.Tenn.1970). The defendant submitted a plan as ordered, but, on August 25, 1970, the Court effectively stayed its order until resolution by the United States Supreme Court of school desegregation cases then pending before it.[9] On December 18, 1970, however, the Court of Appeals for the Sixth Circuit vacated the stay and reinstated this Court's order. *Kelley v. Metropolitan County Bd. of Educ.*, 436 F.2d 856 (6th Cir. 1970).

## II. THE 1971 COURT ORDER

Pursuant to the remand order of the Court of Appeals, this Court held hearings on the Board's proposed revised plan in the spring of 1971. At such hearings, a plan was submitted by the Board, a plan by the plaintiffs, including alternate plans for the elementary schools, and two alternate plans submitted by the Department of Health, Education, and Welfare [HEW], acting as consultant to the Court. The Court rejected defendants' proposal, calling it a "mere tinkering with attendance zones," and "only a token effort." *Kelley v. Metropolitan County Bd. of Educ.*, Nos. 2094, 2956, at 6 (M.D.Tenn. June 28, 1971).[10]

to-minority transfer policy *currently* in effect in Nashville-Davidson County. The United States Supreme Court granted certiorari to decide the constitutional validity of the minority-to-majority transfer provision of the school plan for Knoxville, Tennessee, as approved by the District Court for the Eastern District of Tennessee, *Goss v. Board of Educ.*, 186 F.Supp. 559 (E.D.Tenn.1960), and affirmed by the Court of Appeals for the Sixth Circuit, *Goss v. Board of Educ.*, 301 F.2d 164 (6th Cir. 1962), as well as such policy included in the *Maxwell* plan. The Supreme Court reversed, holding that the minority-to-majority provision of both plans was constitutionally defective. *Goss v. Board of Educ.*, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963).

6. The 1963 consent order substituted the Transitional Board of Education for the Metropolitan Government of Nashville and Davidson County as defendant. By order of December 3, 1964, the Metropolitan Board of Education and its board members were substituted for the Transitional Board.

7. In the interim, the plaintiffs challenged an action taken by the defendant school board and the state secondary athletic association, which

had suspended a predominantly black, inner city school from participation in the interscholastic athletic program. The Court ruled that due process had been denied in the procedure used for suspending the school. The Court did not, however, deal with any aspects of the pupil assignment portion of the desegregation plan. *See Kelley v. Board of Educ.*, 293 F.Supp. 485 (M.D.Tenn.1968).

8. The opinion was issued on July 16, although the judgment was not entered until August 13, 1970.

9. The most significant case involved was *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

10. Although the opinion was issued by this Court, it is impossible to refrain from commending my predecessor on this case, now Chief Judge L. Clure Morton, for an opinion that was remarkable not only in its portrayal of courage by its author in light of the certain community hostility that ensued but also for its forthrightness and clarity in treating the legal mandates and decreeing specific directives and proscriptions.

The Court similarly rejected both of plaintiffs' proposals because they allowed the school board to determine the actual assignment of pupils and implementation of the plan. In light of the Board's past actions and apparently half-hearted efforts to devise a unitary school system that would encourage integration, the Court was naturally reluctant to delegate to the Board the responsibility for specific implementation. Additionally, the Court rejected the elementary school plans proposed by plaintiffs because they included some schools in the periphery of the county. The Court at that time found that the distances involved and the attendant busing costs were so great that it was not feasible to include the outer reaches of the county in a comprehensive busing plan.[11]

The Court did adopt the element in both plaintiffs' and defendants' plans that instituted an "ideal student racial ratio" in the range of 15 to 35 percent black in each school. After rejecting both plaintiffs' and defendants' plans, the Court viewed the HEW plan, as amended after evidence adduced at the hearings, which incorporated geographic zone changes, clustering, contiguous and noncontiguous pairings, and grade restructuring, as the "only realistic plan remaining." *Id.* at 8. Perhaps most significant in terms of its total impact on the school system, the Court, in an effort to insure a racially unitary school system, ordered that over 13,000 more students be transported in the 1971–72 school year than had been bused in the previous year. *Id.* at 4–5.[12] Under the pupil assignment plan as submitted by HEW and adopted by the Court, no school would have a majority of black students.

To discourage future resegregation, the Court made specific orders designed to maximize the potential for an integrated system. Included in the Court's order was a directive for the Board to implement a majority-to-minority transfer policy. The Court also approved the proposed construction of what was later built as the Whites Creek Comprehensive High School because of its proximity to the proposed inner city expressway loop, located approximately half-way between predominantly black and white residential populations. The Court enjoined the construction of the proposed Goodlettsville Comprehensive High School because it would be located in an all-white community and not in proximity to the line of demarcation between the two populations. The Court similarly denied the Board permission to enlarge Hillsboro High School, located in a white community, into a comprehensive high school, enjoined the use of portable classrooms for any purpose other than integration, and, finally, although exempting the predominantly white schools in the outer county from the effect of busing, enjoined the Board from renovating or enlarging by either construction or use of portables any schools that serve less than 15 percent black students after implementation of the plan.

Both parties appealed the 1971 decision of this Court.[13] The defendants appealed on the bases of the Court's asserted failure to comply with Rule 23 of the Federal Rules of Civil Procedure, the invalidity of the Court's requirement of a fixed racial ratio, and the alleged adverse effects on the health and safety of the children resulting from implementation of the plan. Plaintiffs cross-appealed, claiming that their proposed plan should have been approved by the Court because it would have achieved a

11. Noting that the "practicality and feasibility of a plan is a material consideration," the Court made it clear that the litmus test for a unitary school system was not necessarily the integration of each school within the system. *Id.* at 8.

12. Approximately 10;500 more elementary school children were to be bused, and 2,838 more secondary children were to be transported. *Id.* at 4–5.

13. The memorandum opinion was issued on June 28, 1971, whereas the order was issued on July 15, 1971. On July 21, 1971, this Court denied defendants' motion to set aside the memorandum opinion of June 28 on the basis of the Court's alleged failure to comply with Rule 23 of the Federal Rules of Civil Procedure. *See* Appendix B to *Kelley v. Metropolitan County Bd. of Educ.,* 463 F.2d 732, 748–50 (6th Cir. 1972).

greater degree of integration and because the HEW plan, as accepted, placed a disproportionate burden upon black children. The Court of Appeals for the Sixth Circuit affirmed on all grounds, focusing on the discretion lodged with the district court and on the fact that some of the claims raised on appeal had not been adequately raised first in the district court.[14]

## III. SUMMARY OF ACTIONS TAKEN BY THE COURT AND THE PARTIES SINCE THE 1971 COURT ORDER

Although little action having a significant impact on the school system was taken by this Court between the 1971 order and 1979, the parties filed myriad motions, reports, and letters, many of which were not acted upon during the eight-year period. A recounting of pleadings and other communications filed with the Court during these years will help to put the progress of and problems with school desegregation in this county into better perspective.

The first report by defendants was filed with this Court on October 19, 1971, and described the first month of operation under the plan. Two days later, plaintiffs moved to join as parties defendant the Metropolitan Government, the Metropolitan Mayor, and the members of the Metropolitan Council since they controlled the purse strings from which money for increased transportation must come.

Defendants' second report to the Court was filed on March 17, 1972, which proposed the attendance zone and other plans for a new comprehensive high school in the Joel-

ton-Whites Creek area, which would be close to the proposed inner loop in the northeastern part of the county and which the Court in the 1971 order had indicated it would approve when plans were finalized. Additionally, the report proposed capital improvements for schools whose student composition was at least 15 percent black. No action was ever taken on the proposals included in this report.

Three months later, the defendant Board of Education filed a petition, seeking changes in the plan in regard to elementary and junior high school zones and the approval of the use of an annex for an overcrowded school in the southeastern portion of the county unaffected by the Court's busing order. Plaintiffs responded by generally objecting to the proposed changes and requesting changes in the plan as adopted, in that it called for the closure of certain inner city black schools and clustering patterns that required more cross-busing of black children than whites.

A hearing was held pursuant to the motions filed and, by order and memorandum, issued August 17, 1972, and August 19, 1972, respectively, the Court granted plaintiffs' motion to add the additional parties defendant, approved the requested changes in the elementary school zones, but denied the defendants' proposed changes in three junior high schools that would have resulted in lessened degrees of desegregation in those schools. The Court also ordered that the Board purchase additional buses, report to the Court regarding costs of transportation, and close all schools not later than 4

---

14. The Court of Appeals found that this Court had used a flexible racial ratio as a guide and that such a guide had been approved by the Supreme Court in *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Although the HEW plan was "somewhat less stringent" than the plan proposed by the plaintiffs, the Court of Appeals held that the Court's approval was within judicial discretion and had, following the mandate of *Green v. County School Bd. of Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the promise of effectively dismantling the previously dual system. *Kelley v. Metropolitan County Bd. of Educ.*, 463 F.2d 732, 743, 746 (6th Cir. 1972). In regard to defendants'

contentions that the proposed plan would work undue hardships on the children of this county, the Court of Appeals noted that such concerns had not properly been presented to the district court and were, therefore, not cognizable on appeal. Similarly, the Court of Appeals stressed the fact that the district court would be open to motions for modification by plaintiffs if there were adverse effects on black children who were, according to plaintiffs, made to bear the brunt of the busing burden. The HEW plan, as accepted, paralleled the *Swann* plan, and the incorporation of any disparate burden on black children into that plan was not addressed by the *Swann* Court.

p. m. each day. Further, the Court issued a temporary restraining order against the newly added defendants (council members and mayor) from interfering with the Court's order to desegregate. No action was taken by this Court on plaintiffs' concerns about the alleged disparate transportation burden on black children.

With the third district judge sitting on this case since its inception,[15] the Court held a hearing on the Board's report submitted pursuant to the Court's last order and, by order of August 31, 1972, approved that report and dissolved the injunction against the newly added defendants. Shortly thereafter, the defendant Board sought modification of the August 17, 1972, order prohibiting school closure not later than 4 p. m., which this Court granted on September 11, 1972.

The final action taken by this Court prior to pretrial matters and the subsequent hearings in the summer of 1979 involved an action brought by three newly added black City Council defendants as third party plaintiffs against the United States, HEW, and federal officials, as third party defendants. The third party plaintiffs sought to enjoin the third party defendants from continuing to withhold federal funds that would be used for transportation expenses which would be incurred in implementing the Court's desegregation order. After holding that the Court had jurisdiction over the third-party defendants except for the United States, see Kelley v. Metropolitan County Bd. of Educ., 372 F.Supp. 528 (M.D.

Tenn.1973),[16] the Court held that the acts of the third party defendants in refusing to release funds for busing for desegregation purposes pursuant to a recently promulgated policy was illegal. The Court further enjoined the third party defendants from enforcing such an illegal and unconstitutional transportation policy and to act within their discretion upon requests for funds. See Kelley v. Metropolitan County Bd. of Educ., 372 F.Supp. 540 (M.D.Tenn.1973).

Several matters were pending before this Court at the time it addressed the third party issues. They were not dealt with by the Court at that time nor has this Court taken any action on them since that time. As discussed supra, no action was ever taken in regard to the report filed by the defendant Board on March 17, 1972, in which the Board sought approval for construction of Whites Creek Comprehensive High School. Since that time, the Whites Creek School has been constructed. The current zones for the school are incorporated into a petition filed by the Board on July 24, 1978, discussed infra.

Also pending at the time of this Court's last order was the Petition for Approval of the Long Range Building Program, filed on May 30, 1973.[17] This proposal outlining twenty-six building projects has essentially merged into more recent pleadings that describe future plans in greater detail.[18]

The day after the Petition for Approval of the Long Range Plan was filed, defendant Board filed a petition for approval of

**15.** When this case was first instituted and after the three-judge court was dissolved, see text accompanying note 1 supra, it was assigned to Judge William E. Miller. He continued to hear the case throughout the next fourteen years and, when he was elevated to judge of the Court of Appeals for the Sixth Circuit, he issued the memorandum and order of 1970 as district judge sitting by designation. After that order, however, the case was reassigned to Judge L. Clure Morton, who retained the case until he recused himself after the defendant Mayor moved for recusal on August 22, 1972. The case was then assigned to Judge Frank Gray, Jr. When I took the bench in August of 1978, the case was then reassigned to me, making the fourth district judge sitting on this case.

**16.** On December 13, 1973, the Court also granted the original defendant Board of Education leave to intervene as a third party plaintiff in this third party action.

**17.** Over a year later, on December 27, 1976, plaintiffs responded to this petition by generally denying all allegations.

**18.** On the same date that the Petition for Approval of the Long Range Building Program was filed, the Board also filed a motion to produce documents. This motion has little current significance. Discovery matters raised by the parties in this case were disposed of prior to and, in some instances, during the pendency of the recent hearings.

portables for use in kindergartens. *See* Exhibit 55. At the time of the 1971 court order, this county had not extensively instituted the systemwide, nonmandatory kindergarten program presently in existence. As discussed above, the 1971 order had specifically prohibited the use of portables for any purpose other than to achieve integration. The Court left the Board's request for portables unanswered, and the Board utilized portables at kindergarten locations beginning in the school year 1973–74.

Over two years elapsed before either party officially filed further pleadings in this case, although counsel for the Board corresponded by letter to the Court during this period of time.[19] The next official pleading was defendants' motion to amend their previously filed Petition for Approval of the Long Range Building Plan and for further relief, filed October 14, 1976, wherein the defendants specifically described new plans for the proposed Goodlettsville-Madison High School and asked the Court's approval to implement these plans.

The first pleadings filed by plaintiffs since 1972 were the answer to defendants' proposed long range plan and a Petition for Contempt and for Further Relief, both filed on December 27, 1976. Plaintiffs therein moved that defendants be held in contempt for their plan to construct the Goodlettsville-Madison High School,[20] the expansion of Hillsboro, Overton, Hillwood, Glencliff, Stratford, and Maplewood High Schools into comprehensive high schools,[21] the construction of Whites Creek Comprehensive High School,[22] the establishment of the Cole Elementary School annex,[23] and, finally, the proposed closure of Pearl High School, the only traditionally black high school located in the inner city.[24]

Plaintiffs also sought alterations in the Court's 1971 order, stressing, as they had before and after the 1971 order, the dispa-

---

19. Counsel for the Board filed two letters unreported on the Court's docket sheet. The first was filed on August 15, 1973, and relayed the Board's decision to proceed with the plan for using portables at kindergarten sites. *See* Exhibit 55. On October 19, 1973, counsel filed a letter requesting a speedy resolution of the Petition for Approval of the Long Range Building Plan incorporated into the petition filed on May 30, 1973. *See* defendants' memorandum for status conference, filed March 29, 1979. In addition to a relatively insignificant letter filed on November 28, 1973, counsel also filed letters on July 15, 1974, *see* Exhibits 27, 39, and March 14, 1975, *see* Exhibit 37. The 1974 letter informed the Court of the Board's plan to seek funding for high schools that would, beginning in 1978-79, offer comprehensive programs. Included in this plan were the Whites Creek High School and the proposed Goodlettsville-Madison High School. Also listed in the letter were elementary schools that were part of the long-range building plan. In the 1975 letter, counsel related the projected enrollment percentages for Hillwood, Hillsboro, and Stratford, as expanded comprehensive high schools, and informed the Court that funding for vocational facilities at these schools would be sought.

20. Defendants had described this plan in their motion to amend, filed October 14, 1976, discussed *supra*. The 1971 Court order had specifically enjoined the construction of the Goodlettsville-Madison High School, as proposed at that time since, because of its location in the white suburbs and away from the imaginary inner loop divider, it would tend to promote

segregation. Since the 1971 order, however, the defendant Board had changed the proposed site location for the school from the city limits of the suburban City of Goodlettsville to a location nearer to the inner loop extended.

21. Requests for expansion of Hillsboro High School, implicitly disapproved by the Court in the 1971 order when it denied defendants' application to acquire additional property for expansion to a comprehensive high school, had been reiterated in defendants' Petition for Approval of the Long Range Plan of May 30, 1973, and in counsel's letters of July 15, 1974, and March 14, 1975. Also included in these communications were explanations of expansion of other comprehensive high schools, listed above.

22. Such construction had been proposed in defendants' petitions to the Court, filed March 17, 1972, and May 30, 1973, and again in counsel's letter to the Court of July 15, 1974.

23. As reported to the Court on July 15, 1976, the Board reopened Turner School to serve as an annex for the fifth and sixth grades at Cole for the year 1976–77. Cole is located in the southeastern part of the county, outside the "court-ordered" area, whereas Turner is located further in toward the center of the city in the "court-ordered" area.

24. By the time this case was heard in July of 1979, the Board had rejected the plan, as submitted by the staff, to close Pearl.

rate busing burden placed on black children.[25] According to the plan and the Board's implementation of it in the last nine years, black children are bused out of the inner city to schools in predominantly white neighborhoods for grades one through four, whereas white children are bused into the inner city to attend formerly predominantly black schools in grades four and five.

Plaintiffs further requested that the 1971 order be modified to include a requirement that defendants recruit, employ, and assign black personnel commensurate with the ratio of the black students in the school system. Finally, plaintiffs asked the Court to change the 1971 order to incorporate a plan to upgrade Pearl High School and other inner city schools.

In plaintiffs' petition for contempt and further relief, they additionally asked the Court to award attorneys' fees. They had previously requested attorneys' fees in motions dated February 8, 1974, and April 11, 1975, as well as in a motion, filed October 16, 1975, to dispose of the pending motions for attorneys' fees.

The next formal pleading was filed in this Court by defendant Board nearly two years later. In its Petition for Approval of School Attendance Zones for 1978–79, filed on July 24, 1978, and amended on August 18, 1978, the Board asked that the Court accept new zoning plans, grade structures, and feeder patterns.[26] Plaintiffs responded to defendants' request, but no action was taken by this Court.

25. In addition to raising this issue on appeal, plaintiffs addressed this concern in their response of August 14, 1972, to the Board's petition of July 7, 1972. The Court did not deal with this issue in its order and memorandum opinion, issued August 17, 1972, and August 19, 1972, respectively.

26. The petition detailed the zone lines for Hillwood, Hillsboro, Overton, Maplewood, Glencliff, Stratford, and Whites Creek as comprehensive high schools serving grades nine through twelve, the addition of grade nine to McGavock, the county's first comprehensive high school constructed under the mandate of the 1973 Vocational Education Act, T.C.A. §§ 49–2709 *et seq.*, and the addition of grade

The final pleading filed in this case prior to the 1979 pretrial matters was plaintiffs' amendment to the October 14, 1976, Petition for Contempt and for Further Relief, filed on August 28, 1978. Basically, the amended petition reiterates the concerns stated in plaintiffs' earlier petition although in addition it responded to defendants' July 24, 1978, petition.

## IV. THE 1979 COURT ORDER

In the spring of 1979, this Court held a pretrial conference to distill the remaining issues, some of which had obviously laid dormant for years, and to organize the progression of the case. In an effort to simplify the future presentation of the case, the Court divided the pending matters into four phases, which would be heard seriatim: (1) Historical recapitulation of school desegregation in this county since 1971, and consideration of the Board's Long Range Plan, including requests for construction projects; (2) Matters relating to the racial composition of staff and faculty; (3) Plaintiffs' petitions for contempt; and (4) Plaintiffs' petitions for attorneys' fees.

Hearings on Phase I were held in June and July of 1979, at the conclusion of which the Court ordered that the defendant Board devise and submit to the Court a new plan for desegregation that would involve the entire metropolitan county rather than exempt the outer reaches as the 1971 order had done. *Kelley v. Metropolitan County Bd. of Educ.*, 479 F.Supp. 120 (M.D.Tenn. 1979).[27] Because of the short time involved

nine to Cohn High School, the only naturally integrated inner city school, and to Pearl High School, the only remaining traditionally black inner city high school. Additionally, changes were reported for junior high and elementary schools, primarily affecting feeder patterns, decreasing overcrowding, and eliminating one grade schools.

27. The Court encouraged creativity and innovation in the development of a new plan by stressing that the Board should "assum[e] no parameters heretofore ordered by the Court." *Id.* at 122. The Court instructed the Board, in developing the plan, to consider the maximum utilization of existing buildings, especially those in the inner city, the economic factors of

before the beginning of the school year 1979–80, however, the Court approved the zones already in effect for 1979–80, and allowed the Board an additional year before implementation of a countywide plan.

Because the Vocational Education Act, T.C.A. §§ 49–2709 *et seq.*, mandated that each school system provide children with an opportunity to attend a comprehensive high school, those children zoned to a noncomprehensive high school in this county had been allowed to transfer automatically to a comprehensive high school. At the 1979 hearings, it became apparent that white children zoned to Pearl High School in the inner city had used this opportunity to defeat the desegregation efforts at that school, leaving Pearl 96.6 percent black in the school year 1978–79. The Court, therefore, enjoined the Board from further implementation of the automatic transfer policy, ordered it to review all transfer requests, and grant such transfers only for bona fide program reasons. Such an injunction was issued orally from the bench on July 2, 1979, before the conclusion of the hearings.

On August 7, 1979, subsequent to the issuance of that injunction and the already concluded hearings, plaintiffs filed a petition for contempt, charging that the Board had not complied with the July 2 order. Hearings were held during August of 1979 on plaintiffs' motion for contempt. The Court found that the procedure used by the Board in approving subject-matter transfers had "a negative impact upon the desegregation efforts of the School Board" and violated the spirit of the Court's 1971 order as well as the July 2, 1979, order. 479 F.Supp. at 129. The Court, therefore, specifically defined the procedure by which requests for subject-matter transfers should be considered. *Id.* at 124–30. Pursuant to defendants' motion filed after the hearings, the Court permitted the Board to grant any transfer requests of any senior who asked to transfer from a school to which he was zoned to the high school he attended as a junior in the previous year. *Id.* at 131–32.

## V. DEVELOPMENTS SINCE THE AUGUST 1979 COURT ORDER [28]

In response to the August 27, 1979, Court order, the defendant Board began meeting on October 29, 1979, to develop a countywide desegregation plan. In compliance with the Court's suggestion that the Board encourage and consider community input,[29] the Board established a citizens' advisory panel whose members sat with the Board in its deliberations on the plan. Each of the nine Board members, three of whom were black, chose one citizen representative.[30] Five public hearings were held in November of 1979, at which time suggestions from citizens were sought in an effort to develop criteria upon which to base a plan. After the public hearings, the Board and Citizens'

transportation costs and fuel economy, the time and distance involved in transportation, and any other factors that would "impact upon the ultimate objective of a quality educational opportunity for all children in Davidson County through a unitary school system." *Id.* In so instructing, the Court attempted to stress that the goal of the school system and the Court, in its intervention into the operation of that system, should be to insure the opportunity for quality education and that any desegregation remedy should be viewed as a means toward that end rather than an end in itself.

28. Due to the length and complexity of this memorandum opinion, the findings of fact and conclusions of law have not been stated separately, but this entire memorandum opinion shall constitute findings of fact and conclusions

of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

29. The Court noted that the significance of and difficulties in achieving a unitary school system mandate that "the best minds available to the parties, including input from the many well-motivated, thoughtful citizens of the community, should be sought and received." *Kelley v. Metropolitan County Bd. of Educ.*, 479 F.Supp. 120, 123 (M.D.Tenn.1979).

30. In addition, a white interim Board member previously appointed to fill a vacancy continued to sit with the Board as a citizen representative, although his permanent replacement had already been designated and actively participated in the deliberations.

Advisory Panel met five times in December of 1979, to develop criteria for the plan.[31]

During these December meetings, the Board voted to retain three outside consultants who had expertise in the area of school desegregation.[32] A planning team was formed, composed of the three consultants, the Assistant Superintendent for Facilities and Services, the Director of Zoning for the school system, eight principals currently employed by the school system, and two administrative employees of the Board's central office.[33] Input was also received from other experts in the field who had either worked with school systems under desegregation orders or who had academic expertise in this area.[34]

The planning team worked through February 4, 1980, consulting regularly with the Board. The Board met to develop a plan, using the previously established criteria, thirteen times during January and February of 1980, spending over 65 hours on its formulation. Two of these meetings were devoted to public hearings to obtain further community input. *See* Exhibit 177. In the early morning hours of February 5, 1980, the Board adopted a plan, after spending close to one hundred hours of preparation and deliberation. *See* Exhibit 178.

31. The Board adopted the following twelve criteria that should be utilized in the development of the plan:

1. That all schools in the county would be involved in the unitary school plan;

2. That a four-tiered system of grades be adopted, which would consist of 1–4, 5–6, 7–8, and 9–12 as nearly as possible;

3. That a child would not go to more than four schools during his experience, if his residence did not change;

4. That feeder patterns of elementary to middle to high school be established which would allow as many students as possible to remain together for as long as possible;

5. That the goal of this plan be that each school have an optimum of 32 percent black students with a 20 percent range on either side of optimum (12 percent black to 52 percent black);

6. That the goal of the plan be the establishment of a magnet program in any secondary school in which the white minority enrollment is between 10 percent and 20 percent;

7. That, wherever possible, school zones that are integrated by at least 32 percent minority (black or white) without busing for racial balance should be established;

8. That the goal of the plan be to distribute the burden of busing as equitably as possible;

9. That the planners be directed to consider all existing buildings, full utilization of presently used buildings based on projected enrollment, the option of reopening buildings not now in use, expansion of these buildings, and the possible addition of new buildings which will facilitate the conservation of time, distance and fuel and which will facilitate the other major criteria of the plan;

10. That priority consideration be given to the utilization of existing facilities prior to recommendations for construction of new buildings; ·

11. That the average bus ride, one way, be kept to 30 minutes and no route will be longer than 80 minutes (the longest route at the present time under the present plan);

12. That no first and second grade students be required to ride buses more than 30 minutes one way unless it is to the nearest school. *See* Collective Exhibit 154, at 479–80, 483–84, 529, 568.

32. The three outside consultants hired by the Board were Dr. Donald Waldrip, former Superintendent of the Cincinnati Public School System, former Assistant Superintendent of the Dallas School System, private consultant to various school districts on their desegregation plans, and an authority on magnet schools; Dr. Everett Myer, Assistant Director, Educational Opportunities Planning Center, University of Tennessee, Knoxville, Tennessee; and Mr. Nathaniel Crippens, retired Associate Director of the Desegregation Assistance Center, University of Tennessee College of Education, Knoxville, Tennessee.

33. The principals represented elementary, junior high, and high schools, including schools formerly unaffected by the Court order as well as those within the 1971 order. Of the eight principals selected, three were black. Of the two administrative personnel, one was black and one white.

34. The five experts consulted by the Board and planning team were Dr. Jay Robinson, Superintendent of the Charlotte-Mecklenburg, North Carolina School System; Dr. Robert Crane, Sociologist and Professor at Johns Hopkins University; Dr. James Barnes of the Northeastern Desegregation Center, Hartford, Connecticut; Dr. Vern Cunningham, court-appointed Master of the Columbus, Ohio School System; and Dr. Richard Pride, Associate Professor of Political Science, Vanderbilt University, Nashville, Tennessee, and author of a study on the phenomenon of "white flight" in Louisville, Memphis, and Nashville.

The plan, thus developed and approved, was submitted to the Court on February 11, 1980. In its regular February 12, 1980, meeting, however, the Board voted to amend the plan. Such amendment was filed with the Court on February 14, 1980, by way of affidavit of counsel for defendant Board. Plaintiffs filed their objections to the Board's proposed plan on February 29, 1980. A diverse group of plaintiff-intervenors,[35] representing schools slated for closure under the Board plan, requested and were granted permission to intervene and filed the rudiments of an alternative plan on February 29, 1980. The intervenors' plan was modified and refined during the course of the hearings and submitted with greater detail in their proposed plan on April 14, 1980.

Hearings in this case recommenced on March 3, 1980, and were held for sixteen days in March, nine days in April, and ended with closing arguments on May 1, 1980. During these hearings, testimony was received regarding the plans submitted by both the defendant Board and the intervenors. Before the hearings started, while they were in progress, and even thereafter, the Court received several hundred letters from parents, interested citizens, and community groups, all of which were made a part of the official record in this case. A comparable number of letters was received by the defendant Board. The compendium of such letters to the Board was introduced into the record as Collective Exhibit 170. Amicus curiae briefs were filed by the Metropolitan Nashville Education Association, the League of Women Voters, and the American Education Legal Defense Fund. The three black members of the Board filed a dissent to the plan proposed by the Board and also testified at the hearings. Another white Board member also filed a separate, written dissent from the plan.

During the course of the hearings, the plaintiffs were offered the opportunity to file an alternative plan. This offer was first declined but later accepted by the plaintiffs. The additional time requested in which to develop such a plan, however, appeared to preclude a resolution of the case by the beginning of the school year 1980–81 and, therefore, no such plan was presented. The plaintiffs did, through their expert witness, Dr. Hugh Scott,[36] offer specific objections, recommendations, and suggestions to the Court.

During the pendency of the hearings and thereafter, the Court read all communications from the public and studied in detail the plans proposed by the defendant Board and the intervenors, the objections filed by the plaintiffs, and the concerns and suggestions presented in the amicus briefs. The plans and objections thereto will be described below.

## VI. PROPOSED DESEGREGATION PLAN SUBMITTED BY DEFENDANT SCHOOL BOARD

Several basic principles, developed initially by the Board as criteria to be used in

---

**35.** The intervenors represented parents and concerned citizens from the following areas:

(1) the Bellevue community, which is a growing, predominantly white area in the southwest portion of the county in which the Board proposes to close Bellevue High School, leaving only a junior high;

(2) the Joelton community, which is a rural, predominantly white area in the northwestern part of the county where the Board proposes to close Joelton High School, leaving it operational as an elementary and junior high;

(3) the inner city, integrated neighborhood surrounding Cohn High School; and

(4) the almost totally black neighborhood adjacent to the inner city Pearl High School.

The Court cannot help but be pleasantly surprised as well as exceedingly gratified that citizens from these communities with diverse concerns and needs have bound together in a spirit of cooperation and industry. It is to be hoped that these citizens will continue to work together in the coming years to insure the effectiveness of a unitary school system in this county.

**36.** Dr. Scott is presently Dean for Programs in Education and Professor of Education at Hunter College of the City University of New York. He has been a professor of education at Howard University, Superintendent of Schools for the Public Schools of the District of Columbia, Region Assistant Superintendent for the Detroit Public Schools, and has published numerous articles relating to education.

formulating the plan, see note 31 supra, are woven into the plan as finally adopted and submitted to the Court although rigid adherence to these goals was apparently not always possible. The Board determined that a four-tiered grade structure was the most conducive to integration efforts and that such grade structures would, when feasible, consist of grades 1–4, 5–6, 7–8, and 9–12. The Board adjusted the previous range of percentage of black students per school from 15–35 percent, as adopted by the Court in 1971, to an optimum of 32 percent black with a range of 20 percent in either direction, thus allowing a given school to have only 12 percent black or as much as 52 percent black. The Board focused on the concern of lengthy bus rides by setting a limit of 80 minutes for the longest one-way bus ride [37] and 30 minutes for first and second graders unless a longer ride is necessary to reach the nearest school.

### A. Senior High School Plan

The Board plan provides for the retention of the eight existing comprehensive high schools to serve grades 9–12, and the immediate closure of only two of the nine traditional high schools. Joelton High School, in the northwest portion of the county previously unaffected by the Court order, and Bellevue High School, in the southwestern corner of the county, also outside of the Court order, are slated to be closed as high schools but retained as junior highs. The Board proposes to maintain Hume Fogg High School, located in downtown Nashville, as an open-zoned, vocational-educational school for grades 10–12. West End Junior High School would be converted into an open-zoned, magnet school for the academically gifted and would serve grades 7–8 the first year, with one grade per year being added thereafter. In addition to Hume Fogg, only two schools will be limited to grades 10–12. The Board recommends a gradual phasing out of Pearl High

School, discussed infra. Because of the building capacity of DuPont High School, it is not possible to accommodate ninth graders there using the present zone. With these exceptions, all other comprehensive and traditional high schools would serve grades 9–12.

The Board proposed two alternative plans regarding the two existing inner city high schools. The primary plan calls for the construction of a new inner city, comprehensive high school in a contiguous zone around the present Cohn and Pearl High Schools but somewhat smaller than the existing zones for the two schools.[38] In the meantime, the Board suggests that those students who have been attending Pearl, Cohn, and Hillwood, a comprehensive high school located in a white neighborhood southwest of the inner city to which students from the inner city have been bused, remain at those schools. Those children who, under the old plan, would have entered either Pearl or Cohn beginning in the ninth grade would be zoned to Cohn, resulting in a gradual phasing out of Pearl. Since no students outside of the inner city would be zoned to Pearl during the three-year phasing out period, it would be overwhelmingly black. In fact, the Board projects that Pearl's student population would be 92 percent black in the year 1980–81. Cohn, on the other hand, would be within the 12–52 percent range approved by the Board. In contrast, Antioch, located in the southeastern part of the county in a predominantly white neighborhood and slated to receive some students formerly zoned to Pearl, would have a projected black attendance of only 5 percent. Once Pearl is phased out, however, black students in the noncontiguous, former Pearl zone would be zoned to Antioch, raising the percentage to 18 beginning in the 1983–84 school year.

The Board outlined an alternative plan encompassing the inner city high schools in

---

**37.** Some white children are presently bused 80 minutes for nonintegration purposes to attend the nearest school.

**38.** Although the Board has not chosen a specific site for Pearl-Cohn, the staff has studied the possibility of using the site of the present Cockrill Elementary School, located close to the current Cohn building.

the event the Court did not accept the above-described plan. This alternative plan entailed the closure of both Pearl and Cohn as regular high schools and the rezoning of students now zoned to Pearl and Cohn (except for those students in the present Pearl zone who would attend Antioch) to Hillwood and Hillsboro, both comprehensive high schools located in predominantly white neighborhoods.

The second and final proposal for high school construction involves a new Goodlettsville-Madison-Trinity Hills Comprehensive High School, the plan for which the Board has essentially been seeking approval from the Court since 1972. The present Goodlettsville and Madison High Schools would be closed but retained as junior high schools. Students from northwest Nashville living southwest of Maplewood High School would be bused to the Goodlettsville-Madison High School, giving it a racial ratio within the approved range. Additionally, Stratford Comprehensive High School, whose zone would be contiguous to the zone for the proposed new school, would be within the approved range without pairing with a non-contiguous neighborhood. In contrast, Maplewood and Whites Creek Comprehensive High Schools, also contiguous to the proposed zone for Goodlettsville-Madison, would have a racial ratio of 54 and 58 percent black, respectively, both slightly above the approved range.

The original Board plan contemplated the closure of East High School, located in what is called East Nashville north of the Cumberland River. The Board on February 12, 1980, however, amended the plan to study the feasibility of leaving East open beyond 1983 and revising the previously adopted zone for the new Goodlettsville-Madison Comprehensive High School. It is projected that East would have a student population consisting of 55 percent black students, a ratio slightly over the approved range. With the exception of East, Maplewood, Whites Creek High Schools, and Antioch for the interim period, all other comprehensive and traditional high schools in the county would have racial ratios within the approved range.

During the period of construction of the new Goodlettsville-Madison High School, the Board suggested that inner city students be bused to both Goodlettsville and Madison, giving each of these schools a 12 percent black population. In the event that the Court disapproved of the construction of the Goodlettsville-Madison High School, the Board adopted an alternative plan that would convert Goodlettsville High School to a junior high school, serving grades 7–9 from the present Goodlettsville and Maplewood zones and altering the Maplewood grade structure from its present 9–12 tier to a 10–12 school. Under this plan, both Maplewood and Goodlettsville would have racial ratios within the approved range. The same noncontiguous zone as established for the primary interim plan would be assigned to Madison, making it 12 percent black.

### B. Junior High School Plan

With the exception of DuPont Junior High School, the Board proposed that all junior high schools house grades seven and eight. Because DuPont Senior High cannot accommodate grades 9–12, the Board suggested that DuPont Junior High serve grades 7–9, including the middle portion of the area otherwise zoned to Donelson that consists of children who would be bused to DuPont for ninth grade.

As previously discussed, Bellevue and Joelton Senior High Schools would be retained only as junior highs. The Board plan included five noncontiguous zones from which children living in the inner city and in northeast Nashville would be bused to integrate Bellevue, Donelson, Apollo, Goodlettsville, and Neely's Bend Junior High Schools, all of which are suburban, predominantly white schools. In addition, the predominantly white suburban children in the Antioch zone in the southeastern portion of the county would be zoned to Cameron Junior High School, located in the inner city. By expanding and annexing the nearby Johnson Elementary School, previously closed by the Board, Cameron would

become one of two middle schools serving grades 5–8. The fifth and sixth graders would be bused into the Cameron Complex from the same zone as the seventh and eighth graders. The second middle school serving grades 5–8 would be the Donelson Complex, located in the eastern part of the county. It would be comprised of the present Donelson Junior High School and the nearby Donelson Elementary School and would receive the same children from the northeastern part of the inner city in all four grades.

## C. Elementary Schools

As discussed above, the Board developed a two-tiered elementary structure of schools housing grades 1–4 and 5–6. There are, however, many variations in this formula in the final plan due primarily to transportation distances and degrees of natural neighborhood integration surrounding existing elementary schools. Three schools in East Nashville north of the Cumberland River are scheduled to serve grades 1–6 from integrated neighborhoods surrounding them.[39]

In addition, a fourth school would be retained as a 1–6 school. The Board's criterion that no student should be bused for more than 80 minutes except to the nearest school precluded the Board from attempting to integrate Harpeth Valley Elementary School, located in the suburban, predominantly white southwestern portion of the county. The Board had initially assigned these 42 children to an inner city school but later altered that assignment due to the travel distance involved. Harpeth Valley would thus remain overwhelmingly white.

Similarly, the Board's criterion precluding busing for first and second graders for more than 30 minutes except to the nearest school affected inner city children who normally would have been bused to one of three 1–4 centers in the eastern part of the county. The Board, therefore, proposed to give these children a choice between attending Buena Vista, located on the edge of a zone contiguous to theirs, or one of the three schools to the east. They would then attend Jackson, Hermitage, or Dodson Elementary School in the Donelson cluster for grades three and four and the Donelson Complex for middle school in grades five through eight.

The thirty minute limit on busing for young children also motivated the Board to reconsider the pairing of those children in East Nashville, just north of the Cumberland River, with the three elementary schools in the Neely's Bend area to the northeast. These inner city children near Caldwell Elementary School would have to travel more than thirty minutes to attend the Neely's Bend area schools and vice versa. The Board, therefore, devised a meeting place for these children at Baxter School, located to the northeast of the inner city. Travel distances for the inner city and the more suburban children would be comparable. After attending Baxter, the inner city children would then be bused to one of three 3–6 centers in the Neely's Bend area. The Neely's Bend children would be bused to Baxter for grades one and two but would return to their neighborhood schools for grades 3–6.

The Board developed eleven clusters in which the children would not have to be bused to schools in noncontiguous zones. By drawing zoning lines to take into account the racial makeup of populations within the clusters and pairing schools within the clusters, the Board provided these children the opportunity to stay within their cluster for their entire elementary educational experience. Two clusters out of the eleven, however, are unique. The fifth and sixth graders from the northernmost portion of the Crieve Hall cluster, a somewhat triangular zone in the south central part of the county, are zoned to Binkley

---

**39.** These three schools are Cotton, Howe, and Ross, contiguous to each other and located in the East and Stratford High School zones. It is extremely disheartening that only three schools in the county can boast of integrated neighborhoods from which the children can attend true neighborhood schools in an integrated setting without the necessity of noncontiguous busing or clustering of schools.

School, a 5–6 center in the contiguous cluster to the southeast, rather than to Crieve Hall, located in their cluster slightly to the southwest of Binkley.

Several clusters form irregular triangles emanating from the center of the county with broadening bases at the county lines. For the most part, the schools toward the inner city are 5–6 centers and the more suburban schools are designated as 1–4 centers. This pattern is reflected in five of the seven clusters forming irregular triangles. In three of the elementary clusters the schools are located or zone lines drawn so that the pattern described above is inapplicable.

Because of the lack of neighborhood integration, the Board determined that six clusters had to be paired with six other noncontiguous clusters and thus busing across other zones would be necessary. Inner city children surrounding Cameron Junior High in an irregular triangular zone cut out from the Napier cluster would be paired with an irregular circular zone in the far southeastern part of the county. These inner city children would be bused out to the suburban schools for grades 1–4, whereas the suburban children would be bused in to Cameron for grades 5–8. Similarly, inner city children in the north Nashville Wharton zone would be bused to suburban schools in the southwestern part of the county for grades 1–4, and the suburban children would be bused to Wharton for fifth and sixth grades.

The same pattern applied in the zone for children in northeast Nashville around Haynes School who would be zoned to one of three 1–4 centers in the northeastern part of the county, and the fifth and sixth grade children in the Amqui zone who would, in turn, be bused into the city to Haynes. Again, the pattern repeated itself for those children in the zone north of but contiguous to the Haynes zone. They would be bused north to Union Hill or Goodlettsville for grades 1–4, and the suburban children bused in to Brick Church for fifth and sixth grades. Predictably, the children in grades 1–4 in the inner city zone around Buena Vista would be zoned to either McGavock or Hickman to the east and the more suburban children bused in to Buena Vista for grades five and six. The two pairings of the noncontiguous zones in the suburban Neely's Bend area with inner city Caldwell, and the inner city North Nashville zone with the Donelson zone have already been discussed.

Only one pairing deviated from the pattern of busing inner city children to more suburban schools in grades 1–4 and suburban children into the city for grades five and six. In the zone north of the Cumberland River containing Shwab, Joy, and Gra-Mar, children would remain in that cluster, attending Joy for grades one and two and either Gra-Mar or Shwab for grades 3–6, whereas the children in the zone slightly to the northeast attend Bellshire for grades 3–6 but are bused in toward the city to attend Joy for grades one and two.

Although the Board has adopted a plan to convert West End Junior High to a junior and senior high magnet, with the alternative plan for Pearl to be converted into a magnet, the Board has not chosen which, if any, elementary schools would become magnets. The planners, however, have recommended that five elementary schools be made magnets, feeding into the secondary magnet. This recommendation includes Stateland, located in the Donelson cluster in the eastern part of the county and formerly used as an annex for Dodson School; Dan Mills, located in the Inglewood cluster to the northeast of the inner city; Burton, located in the Stokes cluster in the southern suburban area of the county; Parmer, also in the Stokes cluster toward the southwestern part of the county; and Ford Greene, in the inner city in the Head cluster.

Under the Board's plan, nine elementary schools would be closed for all purposes. Three of these schools are in the inner city whereas the other five are located in more suburban areas to the southwest and southeast of the inner city.

The Board projected that in 1980, under its proposed plan, 87 percent of all elementary school students would attend schools

within the approved racial ratio range of 12 to 52 percent black. With the exception of DuPont and Harpeth Valley Elementary Schools, all of the twelve elementary schools whose racial ratios fall outside the approved range are located north of the Cumberland River. In these ten schools, the percentage of blacks is projected to exceed 52 percent. This deviation can be explained by the fact that the black population is most concentrated north of the river where blacks make up 40 percent of the population whereas throughout the county blacks comprise only 32 percent. The largest percentage of blacks attending elementary schools would, however, only be 63 percent, which is projected for three elementary schools.

## VII. PLAINTIFFS' OBJECTIONS TO THE BOARD PLAN

As noted above, plaintiffs did not propose a plan as such. However, very specific objections were made and specific recommendations were offered through plaintiffs' pleadings and witnesses.

### A. *Disparate Burden*

Plaintiffs' major complaint to the 1971 plan and to that of the Board now under consideration is the disparate burden each places upon young black children. Both plans are premised upon the "busing out" of black children in grades 1–4, and the "busing in" of white children in grades 5–6. Plaintiffs insist that such a premise places all of the burden of the desegregative effort upon the young black child while permitting the young white child to attend a neighborhood school. They postulate that the early primary grades are the most formative years of a child's educational experience. Continuity is extremely important during these years. The ability of a kindergarten teacher to discuss a child's problems and progress with a first grade teacher, and the first grade teacher with the second, is important educationally to both white and black children, but even more so to the child from a socioeconomically deprived background in which parental support may not be as present.

Plaintiffs point out that under the proposed plan, as well as under the 1971 order, the inner city black child never goes to the same school for first grade as he does for kindergarten.

Another claimed damaging impact on young black children in the plan is that, in most instances, the black children are taken from a familiar, friendly, supportive environment into what can often be a hostile and unfamiliar environment. This is asserted to be particularly harmful to black children from an underprivileged socioeconomic status. Once again, it is also harmful to white children, but not as severe in higher socioeconomic families.

A third problem cited by plaintiffs with the transportation of young black children away from their familiar environment in the early grades is the inability to have parental contact and input. Parents of lower socioeconomic status are much less likely to have linkage with the teacher, particularly when the assigned school is in a distant suburb inaccessible by public transportation.

### B. *Educational Unsoundness of the Four-Tiered Structure*

Under the proposed Board plan as well as under the present 1971 order, most children will go to at least four schools during their K–12 school experience and almost all black children will go to five schools. Not only plaintiffs' experts, but also all those who testified for intervenors as well as the Board, assert that a three-tiered structure is far more educationally sound. In its admission of this principle, the Board acknowledged that its use of a four-tiered structure plus kindergarten was chosen to facilitate the achievement of desired racial ratios.

### C. *Closure of Inner City Schools*

The Board plan proposes to close five more elementary schools in or on the edge of predominantly black areas. In addition, under the various alternatives of the plan, Pearl High School is contemplated for either closure or conversion to a magnet school. Pearl is the only remaining histori-

cally black high school. Plaintiffs argue persuasively for the retention of Pearl because of its historic contribution to the black community of Nashville, the contribution of its graduates to the nation, its value as a source of ethnic pride and symbol of black achievement, and the fact that it is a sound structure, aesthetically attractive, and functional. The building was designed by black architects, constructed by black contractors, and has graduated black persons who have gone on to great achievements in the region and the nation. Such role models are of significant importance to young black children seeking to break out of the bonds of poverty and overcome the unfortunately still-present effects of our shameful two-hundred-year history of discrimination against the black citizens of this land. Substantial proof from many prominent black leaders was offered in support of these contentions.

D. *The Rightness of Whiteness or "Osmosis" Effect*

The Board plan and the 1971 plan are both premised upon a goal that the percentage of black students in each school represent the percentage of blacks in the county. This is justified upon the philosophy that each public school should be a microcosm of the community it serves and that it is necessary to use such a percentage mix in order to have enough blacks "to spread around," thereby achieving racial balance in all schools, and upon the now questioned sociological studies that attempted to demonstrate an educational osmosis effect on a black child from being in a majority white school setting. Plaintiffs insist: (1) the microcosm effect is practically impossible; (2) the "spreading around" effect is inherently disparately burdensome to blacks; and (3) the osmosis theory is invidiously racist and based upon assumed black inferiority. Plaintiffs assert that to contend that a black child can receive a quality education only in a white majority classroom is blatantly racist and paternalistic. In addition, because the earlier sociological studies that may have indicated an osmosis effect have been subjected to such serious methodological question, and because more recent studies have indicated the incorrectness of the earlier conclusions, they should be disregarded.

This point of departure demonstrates the evolution of desegregation philosophy that has occurred among educators, sociologists, black parents, and plaintiffs in this litigation as well as in similar litigation across the country. Historically, black plaintiffs felt the necessity to be in a majority white school in order to be assured of equal distribution of educational funding. The assertion and recognition of the right to equal protection of the laws has rendered this reason irrelevant in today's climate. A dramatic role reversal has taken place. In this case, we have a white majority of the school board, acting on the advice of a white desegregation expert, recommending to the Court *more* busing to achieve *more* racial balance. Equally contrary to earlier posture, the black plaintiffs urge upon the Court *less* busing, *more* neighborhood characteristics to the assignment plan, and the permissibility of majority black schools.

Based upon these and other criticisms of the Board plan, the plaintiffs recommend specific features which any revisions should incorporate:

1. An intervention program that addresses the needs of students who are deficient in the basic skills, especially when such students are bused to schools not in their immediate neighborhood;

2. A program at all schools that provides relevant educational experiences geared to helping students acquire an understanding of the life and culture of black Americans;

3. Programs and services that address the needs of students, black and white, who are achieving below the national norms in the basic skill areas;

4. A mechanism that insures that black students do indeed gain equitable access to the specialized programs offered in the comprehensive high schools;

5. A commitment to the maintenance of Pearl High School;

6. The concept that either whites or blacks can constitute the minority racial group;

7. The maintenance of the kindergarten and the primary grades as an integral educational unit;

8. A busing formula that does not shift black students in disproportionate numbers to white students;

9. A commitment not to dislocate black students disproportionately in the kindergarten and early grades;

10. An improved systemwide ratio of black teachers and black administrators;

11. A policy that permits a greater number of black teachers to be assigned to predominantly black schools.

## VIII. THE INTERVENORS' PLAN

The plan submitted by the intervenors was hurriedly prepared and therefore understandably lacks refinement in some of its details. It consists of a three-tiered structure within six geographical clusters of elementary, middle schools, and high schools. The elementary schools are neighborhood in character and admittedly do not make maximum utilization of buildings, nor have the neighborhood lines been drawn with a view to maximize integration possibilities within the neighborhood concept. The range of black-white student population ratios for elementary schools within the various clusters are:

E Cluster—from 100 percent white at Union Hill to 99 percent black at Kings Lane

Q Cluster—from 94.4 percent white at Stratton to 82.7 percent black at Glenn

U Cluster—from 99.4 percent white at Stanford to 88.8 percent black at Caldwell

I Cluster—from 97.2 percent white at Berry to 86.7 percent black at Napier

T Cluster—from 98.7 percent white at Crieve Hall to 98.3 percent black at Ford Greene

Y Cluster—from 98 percent white at Harpeth Valley to 99.2 percent black at McKissack

(Exhibit 227). The elementary student assignment plan did not consider kindergarten, or special education students, or building requirements. (Exhibit 179).

The middle schools within each cluster join a number of the elementary schools to feed each middle school. No noncontiguous zones are utilized to achieve greater degrees of integration. The ranges of black-white student populations are:

E Cluster—from 97.4 percent white at Goodlettsville to 70.8 percent black at Ewing Park

Q Cluster—from 94.4 percent white at Neely's Bend to 56.7 percent white at Highland Heights

U Cluster—from 99.1 percent white at Two Rivers to 64.2 percent black at Meigs

I Cluster—from 94.6 percent white at Apollo to 80 percent black at Cameron

T Cluster—from 91.7 percent white at McMurray to 95.6 percent black at Wharton

Y Cluster—from 95.7 percent white at Bellevue to 42.7 percent black at West End

(Exhibit 227).

The high school plan envisions retention of the existing comprehensive high schools, but also would retain Pearl, Cohn, Bellevue, Joelton, Antioch, East, DuPont, Madison, and Goodlettsville as "traditional" high schools. An option would be offered to each student within each cluster of either a comprehensive or traditional secondary education.

The plan contains a number of voluntary components designed to foster community support and also to facilitate integration. Failure to achieve or maintain at least a 10 percent racial minority presence (black or white) within a reasonable time after use of magnet programs and zone readjustments would result in closure of the school. If a school fell below 50 percent utilization it would be closed. Application for transfer from a "traditional" to a comprehensive high school which would have a negative impact on integration would be first sub-

jected to a course offering at the "traditional" school to attempt to prevent the transfer.

The intervenors' plan emphasizes the use of public transportation facilities as both a money-saving device and as a method for establishing natural linkages among students, parents, and the receiving schools. The point is well made that access to a school by public transportation tends to foster parent participation in school activities and in the education of their children, facilitate the participation of children in after-school extracurricular activities, and encourage intercommunity relationships. As noted in the discussion of the Board's plan, noncontiguous zoning between communities, between which there is no public transportation and little other commonality, has many inherent problems and disadvantages. Close coordination between the Board and the Metropolitan Transit Authority is urged in establishing new routes and future school construction.

The high school plan departs from a consistent feeder pattern for the middle schools. For example, some children who went to middle school at John T. Moore in the "T" cluster will go to high school in the "Y" cluster. Some who went to West End in the "Y" cluster will go to high school in the "T" cluster. Litton middle schoolers will be split between the "Q" and "U" clusters. (Exhibits 225 and 226).

The intervenors urge the Court to defer adoption of any plan until 1981–82 in order to implement their suggestion.

Although the voluntary components of the plan offer attractive alternatives designed to foster community support for the school system, the plan is defective in a number of respects.

First, it emanates largely from a parochial desire to maintain high schools in established communities such as Pearl, Cohn, Bellevue, and Joelton in contradiction to the Board's established policy (and state mandate) of a system of comprehensive high schools. There is a growing debate among professional educators as to the wisdom and educational value of comprehensive high schools. This Court need not enter or take sides in the debate except to the extent that the decision may facilitate or deter efforts to achieve a unitary system. Otherwise, it is an educational decision.

It is impossible to justify maintenance of Pearl, Cohn, and Bellevue in the southwest quarter of the county alongside the three comprehensive high schools (Hillwood, Overton, and Hillsboro) that have been built in the same quadrant. At the anticipated enrollment for 1983, these three new comprehensive high schools could accommodate all students in the southwestern quadrant, leaving the Pearl, Cohn, and Bellevue buildings available for other uses, and still have *1156 empty seats*.[40] Under the same 1983 projections, the new Whites Creek Comprehensive High School can absorb all Joelton students and still have *372 empty seats*. (Exhibit 155).

Such underutilization seems economically unjustifiable and there is no basis upon which the Court could mandate it.

More importantly, the intervenors' plan substantially resegregates most of the proposed "traditional" high schools. Initially, Madison would be 97.8 percent white, DuPont would be 98.8 percent white, Antioch would be 96.2 percent white, Bellevue would be 97.1 percent white, and Pearl would be 92.7 percent black. Some of the currently integrated comprehensive high schools would revert to identifiably black or white schools: Overton would become 96.2 percent white, Hillsboro would become 95.9 percent white, and McGavock would become

---

**40.** The following projections were made for 1983 (assuming the construction of both the Pearl-Cohn and Goodlettsville-Madison Comprehensive High Schools):

| | Capacity | Students | Empty Seats |
|---|---|---|---|
| Hillsboro | 1751 | 959 | 792 |
| Overton | 1819 | 1336 | 483 |
| Hillwood | 2190 | 1206 | 984 |
| | | | 2259 |
| Pearl-Cohn | 1100 | 1103 | −3 |

Thus if the Pearl, Cohn, and Bellevue students were incorporated into Hillsboro, Overton, and Hillwood, there would still be 1156 empty places. (Exhibit 155).

96.4 percent white. Intervenors would rely on the voluntary components and magnet aspects of their plan to bring these schools to a minimum 10 percent of either race as a minority in such schools. However, the prospect of such an eventuality is unduly optimistic at best.

## IX. THE COURT'S RESPONSIBILITY

### A. A "Unitary" System

■ Once a finding has been made that a racially discriminatory dual school system has been maintained,[41] it is the responsibility of the School Board, under supervision of the Court, to achieve a "unitary" school system. *Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Perhaps intentionally, no precise definition of what constitutes a "unitary" system has been laid down. In *Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19, 21 (1969) (per curiam), the Supreme Court mandated a system "within which no person is to be effectively excluded from any school because of race or color." This definition was reiterated in the concurring opinion of Chief Justice Burger in *Northcross v. Board of Educ.*, 397 U.S. 232, 237, 90 S.Ct. 891, 893, 25 L.Ed.2d 246, 250–51 (1970) (per curiam).

Pursuant to this Court's direction to seek public input to the proposed plan, the Board invited definitions of "unitary school system" at its public hearings. Some of these bear repeating:

> By the nature of the title an Unitary School System implies oneness of opportunity for all children, oneness of administration, oneness of financial support, oneness of educational philosophy, oneness with Metropolitan Government, and oneness geographically centered at and emanating from the heart of the inner-city.

Councilman William E. Higgins

> A Unitary School System is that system which is designed and functions to the extent that equal resources and access to quality education are available to all parts and groups of a given community.

Rev. Amos Jones, North Nashville Community Council & Social Action

> A unitary school system is one offering each student equal access to the facilities, materials and staff to provide the opportunity to meet his/her educational needs. This uniformity of opportunity must also extend to parent, family and citizen involvement in the educational system.

Tom Phillips, Dodson School PTA

Exhibit 2 to plaintiffs' proposed plan, filed Feb. 11, 1980.

*Brown v. Board of Educ. (Brown II)*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), broke down the barriers excluding black children from attending schools with white children. *Green v. County School Bd., supra,* described the ultimate goal to be a unitary, nonracial system of public education, and onerated school boards to "come forward with a plan that promises *realistically* to work, and promises *realistically* to work *now*." 391 U.S. at 439, 88 S.Ct. at 1694, 20 L.Ed.2d at 724 (emphasis added). *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), identified and utilized transportation of students to achieve racial mix, and gerrymandered zone lines and/or noncontiguous zones as permissible remedial devices to achieve a unitary system. *Milliken v. Bradley (Milliken I)*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), emphasized the *remedial* nature of the Court's responsibility and expanded the charge to include such action as would as nearly as possible "restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.* at 746, 94 S.Ct. at 3128, 41 L.Ed.2d at 1092. *Milliken v. Bradley (Milliken II)*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977),

---

**41.** The defendant, then Board of Education of the City of Nashville, conceded shortly after this case was instituted that the state laws under which defendant operated a dual system were unconstitutional. *See Kelly (sic) v. Board of Educ.*, 159 F.Supp. 272 (M.D.Tenn.1958); *Kelley v. Board of Educ.*, 139 F.Supp. 578 (M.D. Tenn.1956).

specifically approved remediation in the form of educational components designed to "restore the victims of discriminatory conduct to the position they would have *enjoyed in terms of education . . . .*" *Id.* at 282, 97 S.Ct. at 2758, 53 L.Ed.2d at 757 (emphasis added).

Thus the definition of a "unitary" school system has expanded from *Brown* to *Milliken* from a mere destruction of barriers, to pupil assignment, to remediation and quality education.

## B. *Racial Ratios*

As noted above, the thinking of sociologists, educators, legal scholars, black plaintiffs, and jurists has also undergone evolution. Earlier literature and studies of varying methodological purity postulated a benefit to black children from a school setting in which white middle class children were in the majority. This thinking has changed significantly.[42]

*Swann* may have been misinterpreted to state a requirement of racial ratios in all schools unless the Board could carry the heavy burden of proving the rationale of the exception. Thus, it has perhaps appeared that the achievement of racial ratios has become an *end* of litigation of this type, rather than the *remedy* it was conceived to be. District Judge McMillan, in the *Swann* case, indicated that such a future emphasis would be misplaced:

> This court has not ruled, and does not rule that "racial balance" is required under the Constitution; nor that all black schools in all cities are unlawful; nor that all school boards must bus children or violate the Constitution; *nor that the particular order entered in this case would be correct in other circumstances not before this court.*

*Swann v. Charlotte-Mecklenburg Bd. of Educ., supra,* 402 U.S. at 25 n. 9, 91 S.Ct. at 1280 n. 9, 28 L.Ed.2d at 571–72 n. 9 (emphasis in original), *quoting with approval* from Judge McMillan's memorandum of August 3, 1970.

The Supreme Court, in *Swann*, observed the "familiar" metropolitan phenomenon (present in Nashville) of concentrations of black population in one part of the city. It further recognized that, as a result of this phenomenon, "certain schools may remain all or largely of one race until 'new schools can be provided or neighborhood patterns change." 402 U.S. at 25, 91 S.Ct. at 1281, 28 L.Ed.2d at 572. No specific degree of racial mixing is mandated by *Swann* nor is "desegregation" defined as requiring every school to reflect the racial composition of the system as a whole.[43]

Busing and zoning are *"permissible tool[s],"* 402 U.S. at 28, 91 S.Ct. at 1282, 28 L.Ed.2d at 574 (emphasis added), in fashioning a remedy. From *Brown II* forward, the courts' responsibility has been equitable in nature. "In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies . . . ." *Brown v. Board of Educ., supra,* 349 U.S. at 300, 75 S.Ct. at 756, 99 L.Ed. at 1106.

As remedies, each must be subjected to the traditional balancing tests required of a court of equity; effectiveness must be weighed against other available alternatives, and each alternative must be assessed in terms of its relative costs. This was the command of *Brown II*, it was the lesson of *Green*, it was the essence of *Swann*, it reached full flower in *Milliken II*.

---

**42.** In his testimony during the hearings, Dr. Scott repeatedly questioned and criticized the assumption that it is necessarily more advantageous to black children to attend majority white rather than majority black schools. *See* discussion in section 4 of Part VI, *supra. See also* Bell, *Brown v. Board of Education and the Interest-Convergence Dilemma,* 93 Harv.L.Rev. 518 (1980).

**43.** In *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), the Court reiterated that there was no "substantive constitutional right [to a] particular degree of racial balance or mixing . . . ." *Id.* at 434, 96 S.Ct. at 2703, 49 L.Ed.2d at 607, *quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., supra,* 402 U.S. at 24, 91 S.Ct. at 1280, 28 L.Ed.2d at 571.

Such a balancing is particularly appropriate in the case before this Court. Here, we are not dealing with a "conversion from a dual to a unitary system," as the *Swann* Court faced. 402 U.S. at 26, 91 S.Ct. at 1281, 28 L.Ed.2d at 572. This Court has been dealing with the problem for 25 years and this system has had in place a *Swann*-type remedy for nine years. Here we are assessing the effectiveness of the remedy and such changes as are made should be done in light of this experience.

## X.  THE EFFICACY OF THE REMEDY

█ A partial assessment of the remedy under the 1971 order was contained in the recitation of history in Parts II–V above. It cannot be overemphasized that an evaluation and consideration of modifications to the *Swann*-type remedy ·in effect in this county could not be possible had a comprehensive desegregation order requiring busing not been decreed and implemented. Were this Court addressing the situation in this county as it existed in 1971, there would be no alternative but to order the implementation of a plan that entailed school pairings, noncontiguous zoning, and substantial busing. Nothing in this opinion should reflect a diminution of the realization of the necessity of such an order in 1971.

It is only after nine years of zoning and busing to achieve a desegregated system and the changes that have taken place in the community and in the attitude manifested by the School Board that it is possible to reevaluate the efficacy of the remedy incorporated into the 1971 order. With this understanding, the Board's proposed plan will now be scrutinized as to its efficacy in terms of:

1. Its realistic promise of achievement of a unitary system;

2. Its relative burden on black and white children;

3. Its social cost in the deterioration of public support for education;

4. Its educational cost; and

5. Its economic cost.

### A.  *Realistic Promise of Achievement*

The Board's plan was proposed in good faith reliance upon the assumption that the August 1979 order of this Court and the legal precedent of *Swann* required a "more-of-the-same" type of remedy. The plan would achieve an initial racial mix in which blacks will, in nearly all cases, be in the minority. But will these ratios be realistically achieved or, if initially achieved, will they be capable of realistic maintenance?

The spectre that haunts all of the parties to this case, the Court, and the community is a public school system populated by the poor and black, and a private school system serving the affluent and white. The Board presented as one of its witnesses Dr. Richard A. Pride, Associate Professor of Political Science, Vanderbilt University. · Dr. Pride was commissioned by the Board to study "Patterns of White Flight: 1971–1979," and his scholarly study and analysis appear in the record as Exhibit 247. Dr. Pride took the statistic of a decline in white enrollment in the public schools of 22,098 between June 1971 and June 1979 [44] and sought to explain the decline. He found that:

"white flight" is a significant problem in Nashville. In brief, it was found that in 1979 each cohort (grade level) was about 15 percent below what would have been expected in the absence of court-ordered busing, (2) this average cohort loss has increased since 1971, when the average cohort was only 8 percent below expectations, (3) most of the loss in recent years has occurred in the birth to first grade interval, where there was an average loss of 14 percent from expected levels, (4) there is a steady increase in the private school contingent in the school age population, including 1st grade, where the private schools captured 20 percent of the entering cohort in 1978–79, a 9 percent rise in eight years.

---

**44.** In June 1971, there were 66,393 white students in Metropolitan Nashville schools as opposed to 44,295 in June 1979.

White flight also manifested itself as within-system migration. The analysis found that there is a flight of up to 49 percent in some cluster schools located in black areas from among white cohorts which began school in desegregated 1–4 schools. The loss in cluster area schools is congruent with a marked gain in non-court-ordered 1–6 grade schools in many outlying areas.

R. Pride, *Patterns of White Flight: 1971–1979*, at 14–15 (1980). His most disturbing statistical prediction was that we can expect 25–30 percent of the elementary age children to be in private school in the middle to late 1980s. If the goal of previous efforts has been to achieve an integrated school experience, the depressing reality of Dr. Pride's study [45] is that our efforts have been less than fruitful, if not to some extent counterproductive.

This phenomenon is only partially the result of the remnants of racial prejudice. From the testimony in this case, the Court concludes that other parental concerns have a greater impact than the bus ride or racial prejudice. It was apparent from the testimony, from letters received by the Court, from letters received by the Board, *see* Collective Exhibit 170, and from the public hearings conducted by the Board, *see* Collective Exhibit 205, that the greatest concern is with the quality of education received, or perceived to be received. It was testified repeatedly that the important factor is what happens at the end of the bus ride rather than how long the ride.

Except to the extent that the largely undefined (and unfunded) magnet portion of the plan may be so designated, there are no educational components to the plan. It is merely a student assignment plan to provide racial ratios. Such a further disruption without massive efforts to make the public school system more attractive will further deteriorate public support and will engender more flight to private schools. The witnesses for all parties predicted such an increase as an inevitable result of the plan, and the Court so finds.

Further, in consideration of the efficacy of the 1971 remedy and the hoped-for efficacy of the Board plan, the Court received testimony on the improvement in achievement test scores of both black and white children from 1971 to the present. *See* Exhibit 249. No scores were available before 1971 and thus no basis of comparison existed for pre-busing achievement. Different tests were utilized and the statistics for some years may not be comparable. However, there does appear to have been improvement in both black and white stanine scores in both math and reading over the period. The gap between black and white achievement has narrowed slightly, but average black achievement in both math and reading is still well below national norms and the gap between black and white achievement remains substantial.[46]

45. An earlier study of Dr. Pride and Dr. J. David Woodard on the white flight phenomenon in Nashville, Memphis, and Louisville, entitled "Busing and White Flight: Implementation Plans in Three Southern Cities," was presented as Exhibit 246. In this connection, one should note that in the Coleman II Study, Exhibit 63B, Dr. James S. Coleman found that there is an almost inevitable significant loss of white children from public school systems when desegregation occurs. He concluded the analysis of his study by stating:

that the emerging problem with regard to school desegregation is the problem of segregation between central city and suburbs; and in addition, that current means by which schools are being desegregated are intensifying that problem, rather than reducing it. The emerging problem of school segregation in large cities is a problem of metropolitan area residential segregation, black central cities and white suburbs, brought about by a loss of whites from the central cities. This loss is intensified by extensive school desegregation in those central cities, but in cities with high proportions of blacks and predominantly white suburbs, it proceeds at a relatively rapid rate with or without desegregation.

J. Coleman, S. Kelly & J. Moore, *Trends in School Segregation, 1968–73*, at 79–80 (1975). Dr. Coleman's description of cities in which the black population is concentrated in the central city and the suburbs are predominantly white applies to Nashville-Davidson County and is the crux of the problem in this county.

46. In 1978 the average reading gap ranged from 1.2 stanines in the second grade to 1.62 stanines in the eighth grade. Narrowing of the

The "osmosis effect," or use of white children as a principal learning resource for black children, appears not to have had the desired result, at least in isolation. These data strongly suggest the necessity for educational components both as an essential ingredient to the remedy and also as a reinforcement to parental perception of, and *support for*, the system. As noted by the Supreme Court in *Milliken II*, and as is obviously present in this case, "[p]upil assignment alone does not automatically remedy the impact of previous, unlawful educational isolation; the consequences linger and can be dealt with only by independent measures." *Milliken v. Bradley*, 433 U.S. 267, 287–88, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745, 760 (1977).

### B. *Disparity of Burden*

The Court finds that the plan submitted by the Board disparately onerates young black children with the burden of achieving desegregation.

As noted above, with few exceptions, black children do not attend the same school for grade one as for kindergarten. Also with few exceptions, black children are bused out of their neighborhoods for grades 1–4, while white children remain in their neighborhoods for these early grades.

The Court drove the route from North Nashville to Andrew Jackson School. The route covers 20.6 miles and required 42 minutes. More significant, however, than the time or distance is the inaccessibility of the area by other than automobile. A child who becomes ill at school and needs a parent, or a parent who needs a conference with a teacher, will create a transportation problem requiring an expensive solution by taxi or a very time-consuming bus ride with transfers if the parent does not have an automobile. This defies logic and creates an almost impossible barrier to liason between parent and teacher. These children *never* attend a school in their neighborhood

for the entire twelve years, unless they elect for the grades 1–2 Buena Vista option.

Similarly, young black children from the Cameron area are taken substantial distances to Una, Lakeview, Cole, and Haywood. Haynes area young black children travel to Old Center, Gateway, and Amqui. Wharton area young black children travel to the southeast corner of the county to Brookmeade, Gower, and Westmeade. Children in the area of Caldwell school (proposed for closure) would go to a yet undetermined school for kindergarten, travel to Baxter for grades 1–2, travel on out to Chadwell, Stratton, and Neely's Bend in 7–8 and Madison and Goodlettsville (or Goodlettsville-Madison Comprehensive High School) for 9–12. Black children in the shadow of Head Elementary School and Pearl High School would go to Head for kindergarten, travel out to Hill, Woodmont, Sylvan Park, or Eakin for 1–4, come back in to Head for 5–6, travel out again to Apollo for 7–8, and out again to Antioch for 9–12.

No similar treatment of white children exists.

### C. *The Social, Educational, and Economic Costs*

The potentially devastating social cost of a public school system serving only the lower socioeconomic segments of our society has been alluded to earlier. The prospect of such divisiveness, and its probable geometric progression into post-school societal interaction, is frightening. Public education is the cornerstone of democracy, but public education without public support will almost certainly erode to the point that it will no longer represent this solid base upon which we can continue to build.

Dr. Pride's testimony is undisputed and is supported by other witnesses. The Board plan will not only fail to engender a revival of public support, it is also uniformly predicted to engender further exodus from the

---

reading gap by grade level from 1971 to 1978 ranged from a .1 reduction in the sixth grade to a .65 reduction in the second and third grades. Improvement in recent years seems to have plateaued and little reduction appears after 1975. Exhibit 249. *See also* Report on Stan-dardized Testing, prepared by the Board in February 1979, Collective Exhibit 240, in which the Board reported that 77 percent of the public school students in this county achieved scores in reading and mathematics at a level average to or above the national test scores.

public school system. The Court finds that such a result negates the efficacy of the remedy, and it is an unacceptable social cost.

The educational concessions made to facilitate achievement of desired ratios have also been referred to above. The choice of a four or five-tiered system over the educationally preferred three-tiered system is only one of these. The lack of continuity for the child and the difficulty of liason between parent and teacher occasioned by the use of noncontiguous zoning, particularly in the early grades, is an admitted educational detriment. The inability of the child from noncontiguous zones to participate in extracurricular activities after school is a further admitted educational cost of the plan. The allocation of a finite amount of resources to transportation costs rather than educational improvement is inherent in the plan. Dr. Bill Wise, Assistant Superintendent of Schools and a principal witness for the Board, testified that elimination of the cost of transporting students in the first four grades would be sufficient to reduce the pupil-teacher ratio from 25 to 1 to 15 to 1 in those grades. The overwhelming testimony from the educator experts was that the remedial benefits of smaller pupil-teacher ratios in these early grades would far exceed any benefit obtained from an "osmosis" effect. Such educational costs weigh heavily in the balance of this consideration of the efficacy of the remedy.

The Board plan would add transportation costs of $3.5 million with the use of elementary magnets. (Exhibit 193). This Court judicially notices the existence of a national fuel crisis as well as a serious downturn in the economy. Fuel prices åre many times what they were when the plan was implemented in 1971. Some transportation will continue to be necessary. However, rational balancing of cost-benefit demands a consideration of alternative methods of transportation that may be more efficient, and alternatives to transportation as a remedial device.

For all of the above reasons, the Court must reject the Board's proposed plan. The intervenors' plan, although it offers attractive and creative ideas, must also be rejected because of its lack of refinement and the flaws noted in Part VIII above.

The Court lacks the resources to devise modifications to either the Board's plan or the intervenors' plan or to develop an alternative plan on its own. It is necessary, therefore, to refer the plan back to the Board under more specific guidelines. Such a re-referral may result in a deferral of implementation of parts or all of the plan for the coming school year 1980–81. Upon a consideration of this opinion and the guidelines hereinafter set out, the Board will report to the Court by July 1, 1980, on the feasibility of the generation of a new plan for the 1980–81 school year or any parts thereof and the necessity for deferral of development and/or implementation of any such parts.

## XI. GUIDELINES AND SPECIFIC DIRECTIVES

### A. *Tier Structure*

■ The Board chose a four-tiered structure against its better educational judgment in order to facilitate racial balance. In view of the directive which follows this, the Board may now revert to a three-tiered structure. Whether this should be a K4–4–4 or some variation thereof which is more educationally sound and makes better utilization of buildings is a matter for Board determination.

### B. *K–4 (or variation) of a Neighborhood Character*

As recognized in *Swann v. Charlotte-Mecklenburg Bd. of Educ., supra,* transportation of young children which "risk[s] the health of the children or significantly impinge[s] on the educational process" is to be avoided. 402 U.S. at 30–31, 91 S.Ct. at 1283, 28 L.Ed.2d at 575.

For all of the reasons set forth in the findings above, the Board should construct its first tier of kindergarten through early elementary grades of a neighborhood character. Intervenors attempted such a con-

struction under severe time constraints. The expert staff of the Board can do a more refined job, drawing lines that achieve better utilization of space, considering the need for kindergarten, special education, and other federally funded programs, and also maximizing the opportunities for integration.

## C.  *Middle Schools*

A 5–8 (or variation) middle school tier should be constructed which clusters schools from the first tier, but with the objective in clustering of bringing about a minimum presence of at least 15 percent of either race in the minority at each middle school. If necessary to meet this objective, noncontiguous zones may be utilized.  These should be held to a minimum and where utilized, consideration should be given to assignment of the nearest such black or white children to create such presence.  In this respect, consideration should be given to transportation accessibility by public transportation between the noncontiguous zone and the assigned school, as more fully discussed below.  The school chosen for the middle school in each cluster should be as centrally located as possible to the whole of the students assigned thereto.  Exceptions to this objective may be dictated by the location of buildings large enough to accommodate the student population.

The selection of 15 percent is arbitrary, as is any other number which may be chosen.  Preparation of students to live in a pluralistic society makes a biracial, intercultural experience highly desirable.  However, it was not the intent of *Brown* and its progeny to require blacks always to be in the minority; nor should these precedents have been read to require assimilation or amalgamation.  It is not undemocratic, nor does it violate equal protection of the laws to have a system that allows for recognition of and respect for differences in our society. A rigid adherence to racial ratios premised upon the social goal of assimilation, which in the process demeans, diminishes, or benignly neglects cultural and ethnic pride as well as differences, is not only constitutionally unrequired, but socially undesirable.

(*See* testimony of Dr. Walter Leonard.) The 15 percent minimum objective was chosen at the suggestion of plaintiffs because it seems to represent a reasonable attempt to provide intercultural and interracial contact as a foundation for social harmony.  As such it is a goal worthy of the wholehearted support of parents and the community, and for the attainment of which some expense and inconvenience should gladly be endured.

## D.  *High Schools*

The Board's initial plan after 1971 (with tacit approval from the Court at that time) of ringing the city with comprehensive high schools would have brought about complete desegregation.  Had the job been completed and had there not been some errors of judgment in school placement, much of the present controversy could have been avoided.  Ethnic attachment and insistence on the retention of Pearl, and community and parochial insistence upon the retention of Bellevue, Joelton, and Cohn have created political problems for the Board in the pursuit and implementation of its comprehensive program.  The remoteness of Antioch and DuPont has created logistical problems and impeded efforts that would have further implemented this educational decision. Controversy has arisen concerning the validity of comprehensive high schools as an educational vehicle.  Some community pressure has been exerted for at least a partial return to, or the option of, a smaller, traditional high school.  Intervenors suggest through their equity plan the provision of such an option.  Their suggestion has both educational merit and offers the hope of renewed support for the system.  They err in the excess, however, from a desire to please as many as possible.  By proposing the maintenance of all existing high schools, intolerable resegregation results, protected enclaves persist, and, pragmatically, serious underutilization of space is inevitable.  The Board should consider the use of some traditional type high schools either as magnets per se, or containing magnet programs. Pearl, East, and West End appear to be well located geographically for such a magnet approach.  All are in or near the central

city and are served by public transportation. The number and location of such magnet-traditional high schools is a matter for Board determination in the exercise of its educational function and in consideration of financial constraints.

### 1. *Goodlettsville-Madison-Trinity Hills*

This proposed new comprehensive high school has been recommended by the Board since 1972. Land has been acquired. Building age and overcrowding have threatened loss of accreditation to existing high schools in the area served. This construction was a part of the initial plan of the Board for a ring of comprehensive high schools and promises to aid substantially in achieving desegregation. It should be built and the Court approves this portion of the Board's plan with attendance zones set out in Exhibit 14B. However, as discussed *infra*, the Board should include in the attendance zone and construct accommodations for the Old Hickory area (northern half of DuPont zone) in this school. These children can cross the river at Old Hickory Boulevard and are as close or closer to the site as most of the remainder of the zone. There is natural affinity between the Old Hickory and Madison communities. Such a zone modification will relieve overcrowded conditions in the DuPont zone, offer comprehensive education to the children in this zone, and will further integration without the use of the present noncontiguous zone for DuPont from inner city North Nashville. The lower half of the DuPont zone can be assigned to McGavock.[47]

### 2. *Pearl-Cohn Inner City Comprehensive High School*

The Board has determined the advisability of an inner city comprehensive high school and proposed to construct it in the approximate center of a zone now served by Pearl and Cohn High Schools. Although the economic justification may be subject to some question,[48] other considerations weighed heavily with the Board and are equally persuasive to the Court. Both Pearl and Cohn have a long and rich heritage of service to their communities. Both have provided outstanding graduates to the region and the nation. Adjoining as they are geographically, they will bring together a natural racial mix that will enhance the desegregation effort. The combination of names and communities will preserve the symbolic significance of the predecessor schools, and will provide an inner city structure offering comprehensive education to a contiguous and natural zone. Assignment of children in North Nashville (presently assigned to distant DuPont) and children from the Pearl-Head area (presently assigned to distant Antioch) will increase student and community identity with the school, and reduce transportation costs. Adjustment of the southern boundary of the zone, *see* Exhibit 164, to West End Avenue will increase the white percentage of students.

The construction of Pearl-Cohn Comprehensive High School is approved.

### 3. *Bellevue, Antioch, DuPont, Joelton*

These relatively small high schools in the outer fringes of the county have posed a problem to the Board both in implementation of its comprehensive high school plan, and in its efforts to achieve a desegregated system. There has been understandable community resistance to their closure. At-

---

**47.** In 1983, DuPont is scheduled for only grades 10–12 with a population of 967 and a capacity of only 784. McGavock will have 438 empty seats. The addition of some seats to Goodlettsville-Madison-Trinity Hills, plus the relief to be anticipated from some students attending magnet high schools should easily accommodate these DuPont area students. In addition, the DuPont anticipated student body includes students from a noncontiguous zone in North Nashville which will be discussed in the next section. Such a solution eliminates the need

for $1,365,000 expenditure for an addition to DuPont. Exhibit 193.

**48.** *See* discussion of the availability of seating projected for Hillwood, Hillsboro, and Overton, note 49 *infra*. However, with the closure of Bellevue, Antioch, and DuPont as hereinafter discussed, and with the assignment of students from the noncontiguous zones in the natural Pearl-Cohn area from Antioch and DuPont back to a Pearl-Cohn Comprehensive High School, this excess capacity will not be as present.

tempts to bring about a black presence in Antioch and DuPont have necessitated distant noncontiguous zones and excessive transportation costs. All four of these non-comprehensive schools should be closed or converted to middle school or other uses.

Whites Creek was built to accommodate Joelton students. Hillwood was built to accommodate Bellevue students. Antioch students can be accommodated between Glencliff and Overton.[49] DuPont area students can be accommodated between the new Goodlettsville-Madison-Trinity Hills Comprehensive High School and existing McGavock.[50]

### 4. *Proposed Addition to Maplewood*

In the Long Range Plan, with the building of Goodlettsville-Madison-Trinity Hills, Maplewood is projected to have a student body of 1734, 54 percent black, and a permanent capacity of only 1091 plus 499 portable classroom spaces. (Exhibit 155). The Board, therefore, proposes to build a $4,775,000 addition to Maplewood to accommodate 700 students. Since this decision does not affect desegregation efforts, the Court does not either approve or disapprove the proposal. However, adjacent Whites Creek will have 372 empty spaces in the same Long Range projection. If East is opened as a magnet school, much of this overcapacity should also be relieved. Cost consciousness and prudence would seem to dictate a delay in this capital expenditure to determine if zone adjustments to Whites Creek and magnet enrollments do not obviate this problem.

### 5. *DuPont High School*

As noted above, DuPont should be closed. The proposed addition of $1,365,000 to this fringe area school would further frustrate efforts to achieve desegregation. This expansion is disapproved.

### E. *Magnet Schools*

The use of magnet schools as an adjunct to a pupil assignment plan not only offers a voluntary component to the desegregation plan but also adds significantly to the quality of the educational offering. It has proven effective in a number of cities as a method of achieving voluntary integration.[51] Intervenors demonstrated a substantial desire on the part of many residents of the county for the option of more traditional-type high schools. It appears that the utilization of magnet-type traditional high schools, or magnet-type programs contained within several such traditional high schools, would be a significantly beneficial component to the plan. If these traditional high schools were open-zoned, centrally located, accessible by public transportation, offering unique educational opportunities, they should attract an integrated student body. Pearl, East, and West End all seem to meet these criteria. Pearl in particular should be considered for such alternative use. It is an attractive, functional building, accessible by several MTA routes. Such a usage would preserve the building as a source of black pride and symbolism in the North Nashville community. East and West End offer similarly attractive locations and existing facilities. Different magnet programs for each school should be considered.

This component of the plan is left to further development by the Board. Substantial savings should result from decreases in transportation costs in the elementary grades, from use of MTA services, discussed *infra*, and from reduction of noncontiguous zones. These resultant savings should be applied to this and other educational components of the newly devised plan.

49. In the 1983 projection (Exhibit 155) Glencliff will have 308 empty seats and Overton will have 483 empty seats. Antioch is projected to have 1295 students, including 263 students from the noncontiguous Pearl-Head area zone. Excluding these students after their assignment to Pearl-Cohn, *see* section 2 *supra*, there would be 241 more students at Glencliff and Overton above capacity. Some adjustment of zone lines may be necessary from Overton to Hills-boro, which contains 792 empty seats, or the overage may be taken care of by the magnet schools, discussed in section E *infra*.

50. McGavock is projected to have 438 empty seats in 1983.

51. *See* N. Estes & D. Waldrip, *Magnet Schools: Legal and Practical Implications* (1978).

## F. Transportation

### 1. Use of Metropolitan Transit Authority [MTA]

One of the most appealing parts of the intervenors' plan was the proposal for close cooperation with and maximum utilization of the MTA system. It was shown that in many instances, MTA buses travel out toward suburban schools in the mornings virtually empty in order to bring commuters into the city to work. This is generally near school starting time. In the afternoons, MTA buses travel out with some of the same commuters only to return empty. It was further pointed out, and alluded to earlier in this opinion, that the availability of MTA transportation to a school tends to eliminate a feeling of alienation from the school, enhance the opportunity for parent-teacher liason, and open opportunities for after-school participation in extracurricular activities. MTA could establish feeder lines to operate in conjunction with shuttle buses and thereby reduce the number of buses and drivers required by the Board. The opportunities for cooperation and substantial savings in transportation cost are many. They await only imaginative exploration by transportation experts for the Board and the MTA.

The Court is assured of MTA cooperation. The Court directs the Board to immediately initiate and pursue discussions with MTA and to incorporate maximum utilization of public transportation in the design of the middle school plan and high school transportation services.

One of the major deficiencies of the present plan and the Board's proposed plan is the absence of any consideration of transportation for students who desire to participate in after-school, extracurricular activities. The plan must incorporate a reasonable accommodation of this essential component of an education.

Discussions with MTA and planning for open-zoned magnet schools must also consider public transportation as a complement, if not the primary resource, in achieving access to such magnets.

## G. Educational Components

### 1. Elementary Schools

Substantial savings will accrue from the elimination of transportation for racial balance in the elementary schools affected by this order. Savings realized from this source should be utilized for educational improvement throughout the system. The Board shall consider and report its recommendations for educational components to the plan to the Court. Such educational components should be directed toward:

1. Provision of intercultural experiences on a periodic basis to those K–4 children who, because of lack of integrated housing in their zoned neighborhoods, are in largely black or largely white elementary schools;

2. Reduced pupil-teacher ratios in those schools in which the achievement level of the school is below the average for the system;

3. Remediation efforts in those schools or classes within schools made up largely of socioeconomically deprived children who suffer the continuing effects of prior discrimination;

4. Such other areas as the professional staff may recommend and the Board may consider valid in developing ways to attack the problem of disparate achievement between black and white children, and, in general to improve the quality of education in Metropolitan Nashville-Davidson County.

### 2. Curriculum on Black History and Culture

Plaintiffs persuasively represented that this area of education has been largely ignored. The contributions of the black men and women of this country to the progress of our nation is a source of inspiration to children, black and white. The Board responded with a broad brush assertion, without specific examples, that such instruction has been generally incorporated into the curriculum. No evidence was offered that this is being done in a meaningful way or that its implementation was monitored to insure its realization. The plan of the Board will specifically address this question and propose methods of monitoring inclu-

sion of such subject material into the regular curricula, as well as the offering of specific courses on black history and culture in the comprehensive high schools.

### 3. In Service Training and Teacher Assignment

The Board's proposed professional development program, "Together We Can-Together We Will," Exhibit 254, outlines a positive approach to development of understanding, sensitivity, and cooperation in the implementation of a desegregation effort. It represents a good start. The Board and its staff should study further efforts in this regard and propose as a part of the revised plan specific efforts toward:

1. Insuring that teachers and staff are required to undergo sensitivity training to the special needs of black children from an underprivileged social environment; and

2. Insuring that the most sensitive of such teachers are assigned to those schools and classes where the desegregation experience is likely to be most problematic.

### H. Faculty-Staff Ratios

Consideration of black-white ratios in the composition of faculty and staff was reserved until a later stage of the proceedings. Nevertheless, some testimony with respect thereto crept into the hearings thus far. Pending further hearings, the revised plan of the Board should include an affirmative action recruitment and hiring program that emphasizes the replacement of vacancies occurring by normal attrition with black personnel.

### I. Involvement of Plaintiff and Intervenors

The Court has been impressed by the generosity of spirit and cooperative attitude demonstrated by the parties and counsel throughout the hearings on the matter. The Court believes this manifestation of good faith and common desire to achieve a workable solution to difficult problems is representative of the enlightened attitude of the great majority of the general populace of this county.

It is a solid foundation on which to build and we must nurture the climate thus created. In this regard the plaintiffs and intervenors are each directed to designate at least one representative of their choosing to attend regularly scheduled work-discussion sessions with staff members of the Board who are responsible for preparation of the report ordered by this Court on July 1, 1980. Utilization of these persons as a resource, and information relayed from them back to the parties can facilitate finalization of a plan and continue to foster the spirit of cooperation. It is not necessary to reiterate the non-adversarial, non-traditional character of the effort in which we are engaged.

### J. Involvement of the Community

It is the fervent hope of this Court, in its official capacity, and in its unofficial capacity as a resident and parent, that the plan which eventually emerges from these efforts will be one which promotes equal educational opportunity, enhances interracial and intercultural communication and understanding, and improves the quality of education offered to all the children of this community.

To insure the success of the plan, the success of public education in Davidson County, and the success and happiness of our community in the future, it will be essential to enlist and utilize the good will and support of the community. The Board should develop a plan to enlist the aid of such groups as The League of Women Voters, Leadership Nashville, Metropolitan Nashville Community Education Alliance, the Metropolitan Mayor and Council, the media, civic and service organizations, to name only a few of the infinite resources available.